R. ADOLFO DE CASTRO, PROCURADOR DEL CIUDADANO (OMBUDS-MAN), recurrido, v. NELSON CORDERO OTERO, PRESIDENTE DE LA JUNTA DE APELACIONES DEL SISTEMA DE ADMINISTRACIÓN DE PERSONAL (J.A.S.A.P.), demandado y peticionario.

*Número:* CE-87-769         *Resuelto:* 29 de abril de 1992

*Ramón Luis Juliá Ramos*, abogado del peticionario; *Edda Serrano Blasini, Zandra Cordero Rodríguez, Subprocuradoras Auxiliares, y Nívea Raquel Avilés Caratini, Procuradora Auxiliar*, abogadas del recurrido; *R. Adolfo de Castro, pro se; Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General, y Sylvia Cancio Bigas, Procuradora General Auxiliar*, abogados de la Oficina del Procurador General.

## SENTENCIA

La Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.) recurre ante nos de la resolución del Tribunal Superior que le ordena contestar un interrogatorio sometido por la Oficina del Procurador del Ciudadano (*Ombudsman*). El Tribunal Superior le ordenó producir "la evidencia requerídale" como parte de una investigación cuasilegislativa del *Ombudsman* de "las causas para la aparente dilación en los trámites apelativos" (Solicitud de revisión, *Exhibit* VII, pág. 58) de J.A.S.A.P.

Evaluado el interrogatorio bajo consideración y en vista

de los poderes delegados al Procurador del Ciudadano para investigar actos administrativos que alegadamente se ejecuten en forma ineficiente, 2 L.P.R.A. sec. 713, se expide el auto de *"certiorari"* y se confirman la resolución y orden recurridas.

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió una opinión concurrente. El Juez Asociado Señor Rebollo López emitió una opinión concurrente, a la cual se unió el Juez Presidente Señor Andréu García. El Juez Asociado Señor Fuster Berlingeri emitió una opinión concurrente. El Juez Asociado Señor Hernández Denton emitió una opinión disidente, a la cual se unieron los Jueces Asociados Señora Naveira de Rodón y Señor Alonso Alonso.

*(Fdo.)* Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión concurrente del Juez Asociado Señor Negrón García.

I

La sociedad moderna requiere de sus gobiernos la prestación de múltiples y variados servicios. El estado moderno se ha convertido en el orientador y regulador activo de los procesos económicos y sociales, creándose para ello grandes y complicados organismos administrativos.

Ante esa multiplicidad de funciones, el ciudadano se siente confundido. Cuando este ciudadano es afectado adversamente por decisiones administrativas, usualmente no sabe a quién acudir y en ocasiones ni siquiera se percata del perjuicio que se le ha inferido.

El "Ombudsman" ha sido la respuesta en varios países a los problemas que surgen en sociedades democráticas que se complican y burocratizan. Exposición de Motivos de la Ley del Procurador del Ciudadano (*Ombudsman*), Ley Núm. 134 de 30 de

junio de 1977, Leyes de Puerto Rico, págs. 412–413. Véase 2 L.P.R.A. sec. 701 *et seq.*

Desde hace algún tiempo el término "burocracia" superó la inocente definición de "[c]lase social que forman los empleados públicos". *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. I, pág. 222. Hoy, en nuestro entorno social, "burocracia" ha pasado a ser sinónimo de gigantismo gubernamental propiciador de la inactividad, la pereza funcional, la complicación del trámite sencillo que pone trabas a la fluidez del proceso. En ese contexto surge la figura del Procurador del Ciudadano (*Ombudsman*), una especie de "enderezador de entuertos", de desbrozador de caminos, de demoledor de obstáculos en el ámbito de la Rama Ejecutiva. La necesidad de ese funcionario está más que justificada en un país como el nuestro, que en las últimas décadas ha experimentado un vertiginoso crecimiento en el sector público. En la actualidad las agencias y los organismos administrativos sobrepasan la centena, con un mínimo de doscientos sesenta y tres mil (263,000) empleados.[1] Y, sobre todo, por el consustancial proceso de impersonalización en los servicios públicos y la dilución de las responsabilidades en las distintas jerarquías de funcionarios y empleados, que han convertido el servicio público en un ente costoso, innominado, irreconocible y sin rostro.

## II

La presente controversia, si bien *nueva* desde la óptica estrictamente jurídica, es trascendental para el desarrollo de la vida pública del país. Se origina mediante una petición de citación incoada el 7 de agosto de 1981, por el Procurador del Ciudadano ante el Tribunal Superior, Sala de

---

[1] Departamento del Trabajo y Recursos Humanos, Informe Estadístico, Vol. 8, Núm. 5, pág. 28.

San Juan, contra la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.) en virtud de la potestad conferida por la ley para "la producción de la evidencia requerida". Art. 15 (2 L.P.R.A. sec. 715). ¿Tiene facultad dicho funcionario para someterle un interrogatorio escrito a un tribunal administrativo apelativo como lo es J.A.S.A.P.? Ante la respuesta afirmativa del tribunal de instancia (Hon. María M. Pérez de Chaar) sería un *retroceso* que este Tribunal contestara en la negativa.

La justa solución a esta interrogante no admite salidas absolutas; por el contrario, exige una cuidadosa cualificación del asunto. Antes que nada, es necesario dejar sentada la naturaleza *dual* de J.A.S.A.P. pues, definitivamente, no es una típica agencia administrativa como con las que generalmente interviene el *Ombudsman*. Su condición de organismo administrativo cuasijudicial —que adjudica controversias— lo acercan más al ministerio clásico en que se desempeñan los tribunales ordinarios del país. Véanse: *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987); *Díaz Marín v. Mun. de San Juan*, 117 D.P.R. 334 (1986). Sin embargo, ésta no es su única función. También realiza trámites administrativos precedentes a la adjudicación. En resumen, ejercita actos de naturaleza adjudicativa y administrativa.

El esquema legislativo del estatuto creador del cargo del Procurador del Ciudadano permite a este funcionario intervenir e investigar todas las agencias administrativas, incluso los tribunales administrativos y organismos cuasijudiciales.[2] Es por esta razón que no se cuestiona

---

[2] La Ley Núm. 134 de 30 de junio de 1977 (2 L.P.R.A. sec. 701 *et seq.*) excluyó de la Rama Ejecutiva, la Oficina del Gobernador, los Registradores de la Propiedad y la Universidad de Puerto Rico. El P. del S. 542 de 3 de abril de 1978, que expresamente perseguía limitar los poderes investigativos del Procurador del Ciudadano a sólo después que las agencias con funciones cuasijudiciales emitieran una decisión final, no fue aprobado por la Asamblea Legislativa.

También, la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, 16 L.P.R.A. sec. 3001 *et seq.*, privó al Procurador del Ciu-

seriamente su poder investigativo sobre los actos administrativos de J.A.S.A.P. y de otras entidades análogas. A lo sumo, la encuesta judicial sería su naturaleza, alcance y contenido. La Ley Núm. 134, *supra*, es clara: "Al realizar cualquier investigación, el *Ombudsman podrá hacer las pesquisas y obtener la información que estime necesaria a los fines de la misma.* A tales efectos, las agencias deberán dar acceso a los funcionarios y empleados de la Oficina a todos sus archivos y documentos. Asimismo, a los fines de la investigación el Ombudsman podrá celebrar aquellas audiencias privadas e inspecciones oculares que estime pertinentes." (Énfasis suplido.) 2 L.P.R.A. sec. 714. Y para el descargo de sus funciones, más adelante se le faculta expresamente a "tomar juramentos y *declaraciones*, ordenar la comparecencia y declaración de testigos y requerir la presentación de cualesquiera papeles, libros, documentos y otra evidencia". (Énfasis suplido.) 2 L.P.R.A. sec. 715. Aclarado el amplio poder investigativo del Procurador del Ciudadano, examinemos el método de interrogatorios aquí utilizado.

## III

Aunque como primera reacción, causa cierta renuencia el uso de interrogatorios escritos —pues de ordinario su utilización pertenece más bien al proceso civil contencioso en los tribunales *entre partes o litigantes típicos*— a poco reflexionemos, nos percatamos de que es un instrumento adicional apropiado del Procurador del Ciudadano en el proceso de evaluación y mejoramiento de los servicios públicos. Su legitimidad no se discute. No obstante, su uso novedoso —en ausencia de normas específicas que regulen este aspecto— nos mueve a que acudamos a una racional analogía conceptual y examinemos en qué medida la doc-

---

dadano de intervenir en cualesquiera de sus fases. 16 L.P.R.A. sec. 3383.

trina que gobierna el procedimiento civil es válidamente aplicable a controversias como la que hoy nos ocupa en el ámbito administrativo. Abordemos esa tarea.

Hoy día, no existe debate de que el interrogatorio escrito es el mecanismo clásico por excelencia de descubrimiento de prueba. Regla 30 de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Ortiz Rivera v. E.L.A., National Ins. Co.*, 125 D.P.R. 65 (1989); *General Electric v. Concessionaires, Inc.*, 118 D.P.R. 32, 38 (1986); *Sierra v. Tribunal Superior*, 81 D.P.R. 554, 561 (1959); *Shell Co. (P.R.) Ltd. v. Tribl. de Distrito*, 73 D.P.R. 451, 460–461 (1952). En esencia, consiste de un documento contentivo de una (1) o más preguntas que deberá contestar la parte a la que se le cursa. Su uso se estimula y justifica por ser un método económico y sencillo. Estas características, sin lugar a dudas, también lo justifican como instrumento investigativo en circunstancias como las que confronta el Procurador del Ciudadano con un limitado presupuesto operacional.

Ahora bien, su aceptación no significa que toda pregunta del interrogatorio deba contestarse. Se ha reconocido que deben cumplir con ciertos criterios de *razonabilidad. A.R.P.E. v. Chang Louk*, 113 D.P.R. 295 (1982); *Hilton Riviera Corp. v. Tribunal Superior*, 102 D.P.R. 233 (1974). La parte llamada a contestarlo puede objetarlo en su totalidad si resulta opresivo, oneroso o injusto, o sólo parcialmente, aquellas preguntas que persigan obtener información impertinente o privilegiada. Claro, esta determinación corresponderá a los tribunales resolverla en aquellas instancias en que las objeciones sean oportunamente deducidas.

En este sentido cabe señalar que, al igual que ante los tribunales y otros funcionarios relacionados con la administración de la justicia —por variados fundamentos de política pública— en el caso de los organismos administrativos cuasijudiciales hay una esfera que sustancialmente cualifica o hace inaccesible cualquier investigación.

*C.R.U.V. v. Hampton Dev.*, 112 D.P.R. 59, 64–65 (1982); *Ades v. Zalman*, 115 D.P.R. 514, 520–521 (1984). Nos referimos al proceso mental, deliberativo y decisorio de los responsables de adjudicar controversias. De otra manera se violarían los principios de autonomía e independencia que rigen nuestro ordenamiento jurídico. Firmes y fieles expositores de la independencia judicial, creemos que los organismos administrativos con funciones cuasijudiciales, al igual que los tribunales, necesitan un espacio libre de interferencias externas para desempeñar sus funciones adjudicativas sin coacciones de ninguna índole. Definitivamente, ese es terreno sagrado al que no tiene acceso el Procurador del Ciudadano, por más loables que sean sus propósitos.

## IV

Una vez definida la normativa aplicable, réstanos evaluar el interrogatorio bajo consideración para determinar si es opresivo, oneroso o injusto, y si total o parcialmente interfiere con el proceso mental o deliberativo de J.A.S.A.P. Al hacerlo, recordamos:

El *ideal de justicia aborrece los extremos. Se presta a abusos.* Tales abusos en el uso de los mecanismos sobre descubrimientos de prueba es una posibilidad real. Para curarlos no existen recetas mágicas ni antídotos instantáneos. Las modalidades varían. "El término 'abuso de descubrimiento de prueba' ha sido utilizado como un concepto único, pero incluye diversos aspectos. Así, es adecuado subdividir 'abuso' en 'uso impropio' y 'sobreutilización'. Cuando nos referimos a 'uso impropio', incluimos no sólo las violaciones directas a la regla, como faltar a responder a un requerimiento de descubrimiento dentro del tiempo límite establecido, sino también a más sutiles intentos de acosar u obstruir al oponente, como darle respuestas inadecuadas o requerirle información que claramente se encuentra fuera del ámbito del descubrimiento. Por 'sobreutilización' se entiende inquirir más información de la necesaria o apropiada para ese caso en particular. 'Sobreutilización', por su parte,

puede ser subdividida en problemas de 'profundidad' y de 'extensión'; con 'profundidad' nos referimos a requerimiento de descubrimiento de materia que podría ser relevante pero que es simplemente excesiva, y por 'extensión' nos referimos al requerimiento de descubrimiento que va a materias demasiado remotas del caso." (Traducción nuestra.) C.A. Wright, *Law of Federal Courts*, 4ta ed., St. Paul, Minnesota, West Pub. Co., 1983, pág. 542. (Énfasis suplido.) *Ades v. Zalman*, supra, pág. 523.

. Hemos examinado cuidadosa y detenidamente cada una de las preguntas que conforman el interrogatorio,(³) así como la naturaleza de los documentos requeridos. En buena técnica adjudicativa, en términos *científicos* pueden clasificarse en cinco (5) temas: facilidades físicas, cualificaciones profesionales del personal de J.A.S.A.P., volumen y asignación de casos, estándares de eficiencia y productividad, y procedimientos internos para el logro de una mejor administración. Estas clasificaciones reflejan concluyentemente una realidad innegable: *la investigación va dirigida única y exclusivamente al componente administrativo de J.A.S.A.P.* Salvo una interpretación forzada, de ninguna manera puede argüirse que afecta la fase adjudicativa del organismo investigado. Todo apunta a que su único propósito es determinar las causas de la demora en la tramitación de los casos y recomendar medidas concretas para superarlas.

En cuanto a la extensión del interrogatorio, convenimos con la apreciación del ilustrado tribunal de instancia de que el beneficio social resultante de la investigación sobrepasa por mucho los inconvenientes que a corto plazo pueda provocarle a J.A.S.A.P. Esta solución no sólo está en consonancia con los principios que inspiraron el advenimiento

(³) El Procurador del Ciudadano utilizó como modelo en la redacción del interrogatorio las preguntas formuladas por el Comité sobre Normas y Objetivos creado por este Tribunal mediante Resolución de 19 de enero de 1984. Ese comité estudió los problemas administrativos que incidían en las dilaciones en la solución de casos en los tribunales de instancia y formuló normas, guías y recomendaciones para agilizar los procedimientos administrativos.

del Procurador del Ciudadano, sino que hace viable el cabal desempeño de sus funciones. A fin de cuentas, atemperada su génesis escandinava al calor de nuestro sol tropical, "el *ombudsman* necesita para su instauración no copiar fórmulas vagas de modelos estandarizados; porque el defensor, en suma, es un hombre que se calza la vestimenta de protector, adecuando su vida a la sociedad que viene a atender ...". O.A. Gozaini, *Técnica y contenido del defensor del pueblo (Ombudsman)*, 1988-E Rev. Jur. Arg. La Ley 851, 862 (1988).

Por su justeza y juridicidad, confirmamos el dictamen del Tribunal Superior, Sala de San Juan.

— O —

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López, a la cual se une el Juez Presidente Señor Andréu García.

Concurrimos con el resultado a que se llega en la breve Sentencia que emite en el día de hoy el Tribunal en el presente caso, la cual *confirma* el dictamen emitido por el Tribunal Superior de Puerto Rico, Sala de San Juan, ordenándole a la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.) que conteste un interrogatorio que le sometiera la Oficina del Procurador del Ciudadano (*Ombudsman*).

Al así hacerlo, *expresamente rechazamos* cualquier posición que convierta al Procurador del Ciudadano en un funcionario completamente superfluo en nuestro Gobierno y que condene a nuestros conciudadanos a sufrir pacientemente el pesado y burocrático trámite administrativo —y

la revisión judicial del mismo— sin la intervención o ayuda del Ombudsman.(¹)

## I

En relación con el recurso ante nuestra consideración, el Procurador del Ciudadano *intentó* conocer "el por qué" la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.) se demoraba en resolver varios casos sometidos ante su consideración por varios empleados públicos. Dichos asuntos llevaban pendiente ante J.A.S.A.P. desde el término mínimo de un (1) año hasta uno máximo de tres (3) años.(²) Al así intentarlo, y ante la resistencia de dicho organismo administrativo a cooperar con su investigación, el Procurador del Ciudadano le informó a la Agencia que no pretendía intervenir en el proceso deliberativo de la misma como tampoco en ninguna forma influenciar las determinaciones de dicho organismo administrativo referentes a los casos en controversia. Aclaró que únicamente estaba "indagando" respecto a dichos casos de-

---

(¹) La errónea posición minoritaria, sustentada por tres (3) miembros de este Tribunal, a pesar de que le reconoce al *Ombudsman* facultad para investigar a los organismos administrativos con poderes cuasi judiciales, *impediría* que el Procurador del Ciudadano intervenga con dichas agencias mientras el trámite administrativo en controversia esté pendiente y hasta tanto los tribunales hayan tenido oportunidad de revisar la decisión de dichos organismos administrativos.

(²) Del récord surge que fueron siete (7) las querellas por dilación de J.A.S.A.P. en resolver que la Oficina del Procurador del Ciudadano trató de investigar. En esos casos el tiempo transcurrido desde que se sometió el caso a J.A.S.A.P. fue el siguiente:

    A. *Un (1) año* (87-0192-410 Sra. Carmen O. Rosaly Antonetti)

    B. *Casi tres (3) años* (87-02059-410 Sra. Nellie Silva de Santos)

    C. *Siete (7) meses* (87-07305-410 Sra. Gladys González Vázquez)

    D. *Dos (2) años* (88-00385-410 Dr. Vasco Daubon Córdova)

    E. *Dos (2) años* desde radicación de querella ante J.A.S.A.P.; *un (1) año* desde que se sometió caso para la consideración de la Junta (88-000261-410-c Sra. Hilda Roque Ortiz y Sra. Carmen L. Méndez Montañez)

    F. *Un (1) año* (88-00499-410M Sra. Rosa L. Nazario Santiago)

    G. No surge período de tiempo transcurrido en el caso 87-00401-410 Sr. Moisés Seín Feliciano

bido a la dilación o demora del organismo en resolver los mismos.

Procede que se enfatice que la Oficina del Procurador del Ciudadano no era el único "organismo" de nuestro Gobierno que estaba "preocupado" por la tardanza de J.A.S.A.P. en resolver los casos ante su consideración. Para la fecha en que el Procurador del Ciudadano inició su investigación, ya era motivo de preocupación en la Asamblea Legislativa la tardanza excesiva en que se estaba incurriendo en la resolución de los casos ante J.A.S.A.P. Ello lo demuestra el hecho de que el 31 de marzo de 1987 fuera presentada en el Senado de Puerto Rico, y referida a comisión, una Resolución en la cual se proponía la creación de una Comisión Especial para llevar a cabo un estudio de las facultades y funcionamiento de J.A.S.A.P. *con miras a agilizar* la resolución de los casos ante dicha agencia.(³) La propia J.A.S.A.P., consciente de que no estaba funcionando en forma óptima, dio su endoso al estudio propuesto por la antes mencionada Resolución.

Lo anteriormente expuesto es la situación de hechos ante la cual actuó el Procurador del Ciudadano en el presente caso. *¿Tiene poder y facultad para así hacerlo? Sostenemos que sí; veamos por qué.*

---

(³) Véase R.C. del S. 2214 de 31 de marzo de 1987. Aunque dicha resolución nunca llegó a ser finalmente aprobada, la misma refleja la inquietud existente en torno a la lentitud en la tramitación de casos ante J.A.S.A.P. En la Exposición de Motivos de la misma se expresó:

"La Junta de Apelaciones del Sistema de la Administración de Personal tiene jurisdicción primaria para ventilar las querellas de empleados contra las Agencias del Gobierno Central en el caso de violaciones al principio de mérito.

"La experiencia de los querellantes ante esta Junta es que muchas veces sus casos tardan uno, dos, tres o más años en resolverse. Parte de esta demora se justifica por el cúmulo de casos que se ventilan ante la Junta de Apelaciones del Sistema de la Administración de Personal. Sin embargo, surgen situaciones que, a pesar de que podrían resolverse en forma rápida no sucede así. Son muchos los casos donde el empleado no tiene otra salida que solicitar el amparo del Tribunal mediante el recurso de injunction."

# II

El Art. 10 de la Ley Núm. 134 de 30 de junio de 1977([4]) —Ley Orgánica de la Oficina del Procurador del Ciudadano— dispone:

El *Ombudsman* tendrá jurisdicción para investigar los actos administrativos de las agencias y podrá ejercer las facultades y atribuciones que este Capítulo le concede.

Como podemos notar, la Ley Núm. 134, ante, no limita la jurisdicción del Procurador del Ciudadano a la investigación de "actos administrativos" que sean "finales y firmes".

A los fines de la Ley Núm. 134, ante, "acto administrativo" significa "cualquier acción, omisión, decisión, recomendación, práctica o procedimiento de una agencia ...". Art. 2(b), 2 L.P.R.A. sec. 702(b). Conforme al Memorando Explicativo de la Oficina del Gobernador sobre el P. de la C. 63 de 14 de febrero de 1977, págs. 3–4, que se convirtió en la Ley del Procurador del Ciudadano (*Ombudsman*), "[s]e pretende cubrir con esta definición no sólo las acciones u omisiones de un funcionario o agencia, sino también *los procedimientos que se siguen, la forma en que se llevan a cabo sus funciones y se toman las decisiones, y la forma en que se instrumenta el mandato legislativo a través del proceso administrativo*". (Énfasis suplido.)

Por su parte, el Art. 14 de la Ley Núm. 134, ante, 2 L.P.R.A. sec. 713, dispone que "[s]erán materias propias de investigación, cualquier acto administrativo que aparente ser:

(a) contrario a la ley o reglamentos;
(b) irrazonable, injusto, arbitrario, ofensivo o discriminatorio;
(c) basado en un error de hecho o en motivos improcedentes e irrelevantes;

---

([4]) 2 L.P.R.A. sec. 710.

(d) no esté acompañado de una adecuada exposición de razones cuando la ley o los reglamentos lo requieran, o
(e) *ejecutado en forma ineficiente o errónea.*

El *Ombudsman* podrá realizar la investigación a los efectos de recomendar un remedio adecuado". (Énfasis suplido y en el original.)

El transcrito inciso (e) del citado Art. 14, conforme el citado Memorando Explicativo de la Oficina del Gobernador, pág. 9, autoriza "al Procurador General del Ciudadano (Ombudsman) para investigar aquellos actos administrativos que son ejercitados en forma *ineficiente, lenta* o errónea". (Énfasis suplido.)

Procede que se señale, en adición, que el Art. 11 de la citada Ley Núm. 134 dispone, *en relación a la necesidad de agotar los remedios administrativos como paso previo a la intervención del Ombudsman,* lo siguiente:

...no se investigarán querellas en aquellos casos en que *a juicio* del *Ombusdman*:
(a) Haya un remedio adecuado en ley para reparar el agravio, ofensa o injusticia objeto de la querella;

. . . . . .

(f) la querella esté siendo investigada por otra agencia y *a juicio* del Ombudsman actuar sobre la misma representaría una duplicidad de esfuerzos y recursos. (Énfasis suplido.) 2 L.P.R.A. sec. 711.

Resulta obvio que el legislador adoptó una regla flexible de "agotamiento de remedios administrativos" *dejando a la entera discreción o juicio del Ombudsman,* con vista a las circunstancias particulares presentes en cada caso, la determinación de si debe o no permitir que se agote el trámite administrativo disponible antes de su intervención.

Procede enfatizar el hecho de que al poco tiempo de comenzar a operar la Oficina del Procurador del Ciudadano, el Poder Ejecutivo propuso que se enmendara la citada Ley Núm. 134 con el propósito *de excluir* del poder de investigación del *Ombudsman* los actos administrativos realiza-

dos por las agencias en el ejercicio de poderes cuasi judiciales hasta tanto se emitiera una decisión final en el asunto. En otras palabras, se intentó hacer entonces, mediante legislación al efecto, lo que quisieran hacer los Jueces disidentes en la opinión que a esos efectos hoy emiten; esto es, limitar *irrazonablemente* el poder del Procurador del Ciudadano para investigar asuntos pendientes ante las agencias. En aquel entonces, el Ejecutivo propuso que se enmendara el Art. 10 de la Ley Núm. 134, ante, para que leyera de la manera siguiente:

> El Ombudsman tendrá jurisdicción para investigar los actos administrativos de las agencias y podrá ejercer las facultades y atribuciones que esta ley le concede. Disponiéndose, que los actos realizados o realizándose por cualquier agencia en el ejercicio de poderes cuasi judiciales conferidos por ley no se investigarán por éste hasta tanto se emita una decisión final por la agencia. Véase P. del S. 542 de 3 de abril de 1978.

La medida, que ni tan siquiera llegó a considerarse, recibió una fuerte oposición por parte del *Ombudsman. El Nuevo Día*, 26 de abril de 1978, pág. 2; *El Nuevo Día*, 27 de abril de 1978, pág. 5; *El Nuevo Día*, 28 de abril de 1978, pág. 5. Se ha señalado que la misma "hubiera restado mucha efectividad a la función del Ombudsman de erradicar dilaciones irrazonables en la consideración de casos ante las distintas agencias ...". J.A. Moldes Rodríguez, *El Ombudsman como mecanismo de fiscalización gubernamental en Puerto Rico*, 44 Rev. C. Abo. P.R. 141, 156 (1983).

De lo anteriormente reseñado surge con meridiana claridad la discreción y facultad que le concede la citada Ley Núm. 134 al Procurador del Ciudadano para, en beneficio inmediato de los querellantes, investigar las querellas radicadas en su Oficina por alegada dilación de la Junta de Apelaciones (J.A.S.A.P.) en resolver unas apelaciones radicadas por empleados públicos, las cuales estaban pendientes en esos momentos ante dicho organismo administrativo. Ello, a su vez, autoriza a dicho funcionario

a obtener de dicha Agencia la información necesaria para un estudio del procedimiento que se sigue en la misma en la tramitación y resolución de los casos con miras a determinar las causas de la demora y poder hacer en el futuro las recomendaciones pertinentes a la Asamblea Legislativa.

La Oficina del Procurador del Ciudadano no fue ni concebida ni creada *meramente* para recopilar información sobre el trámite administrativo seguido en las distintas agencias administrativas que componen nuestro Gobierno con el único fin de recomendar a la Asamblea Legislativa medidas correctivas de carácter general. *Su objetivo fundamental fue la creación de una oficina que le brinde atención, y solución inmediata, a los problemas que aquejan a los ciudadanos de este País, abrumados por el trámite lento y desesperante de la burocracia gubernamental.* De hecho, la dilación en la tramitación y solución de los procedimientos pendientes por parte de las agencias del Gobierno constituye la causa principalísima de las querellas radicadas por los ciudadanos ante la Oficina del Procurador del Ciudadano.[5]

"[E]l concepto fundamental de la institución [del Ombudsman] es que los ciudadanos tengan *acceso rápido, barato y confiable* a un defensor o procurador imparcial, que no esté involucrado en el proceso gubernamental de toma de decisiones y que esté dotado de facultades para formular críticas públicas y para iniciar acciones reparadoras."[6]

---

[5] Según estadísticas suministradas por la Oficina del Procurador del Ciudadano, de las cuales tomamos conocimiento judicial, de un total de tres mil ochocientas noventa (3,890) querellas radicadas ante dicha Oficina durante el año fiscal 1987–1988, un total de tres mil ochocientas diecinueve (3,819) lo fueron relacionadas con la demora de las agencias en procesar y resolver las mismas; esto es, el noventa y ocho por ciento (98%) de las querellas radicadas.

[6] Henry Abraham, Catedrático de Ciencias Políticas de la Universidad de Pennsylvania, según citado en el Informe a la Cámara de Representantes de 16 de mayo de 1977 sobre el P. de la C. 63, pág. 19.

Para realizar su labor, en busca de soluciones rápidas y justas para la ciudadanía oprimida por la burocracia gubernamental, el *Ombudsman* necesita poder ejercer las funciones que nuestro ordenamiento le concede aun cuando el trámite administrativo esté pendiente. Es por ello que procede en derecho la confirmación del dictamen emitido por el tribunal de instancia en el presente caso.

— O —

Opinión concurrente del Juez Asociado Señor Fuster Berlingeri.

Aunque concurro con los señalamientos normativos y doctrinales de la opinión disidente del Juez Asociado Señor Hernández Denton contenidas en las Partes II, III y IV de ésta, que en general delimitan propiamente el contorno de las facultades del Procurador del Ciudadano, no estoy de acuerdo con lo señalado en la Parte V de esa opinión ni con el resultado al que llega.

Concurro también generalmente con los señalamientos en la opinión del Juez Asociado Señor Negrón García. En su esencia, no son incompatibles con los del Juez Asociado Señor Hernández Denton aludidos, sino más bien complementarios. En particular, coincido con el análisis del Juez Asociado Señor Negrón García sobre la naturaleza del interrogatorio bajo consideración. Aunque no muy convencional, no se trata de un interrogatorio que rebase las facultades del *Ombudsman*.

Más aún, por las razones que señala en su opinión concurrente el Juez Asociado Señor Rebollo López, no creo que debe impedírsele al Procurador del Ciudadano utilizar estos interrogatorios si en su discreción el Procurador cree que con ellos adelanta el desempeño de sus funciones en esta época de tan marcada ineficiencia en la burocracia gubernamental.

Quizás, como intima el Juez Asociado Señor Hernández Denton, en este caso en particular, *por razones de prudencia*, el Procurador del Ciudadano debió abstenerse de requerirle a J.A.S.A.P. contestar un interrogatorio tan abarcador. Pero no es función nuestra anular una actuación del *Ombudsman* sólo porque prudencialmente no fue la actuación más serena o ponderada que podía hacerse en las circunstancias concretas del caso. Para proteger las importantes funciones del Procurador del Ciudadano, sobre todo en esta época cuando son particularmente necesarias, no debemos intervenir con sus facultades en casos como este aun cuando la discreción del funcionario, de haber sido nuestra, pudo haberse ejercido con mayor ecuanimidad. Por ello coincido con los Jueces Asociados Señores Negrón García y Rebollo López en que debe confirmarse el dictamen del Tribunal Superior, Sala de San Juan.

— O —

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton, a la cual se une la Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Alonso Alonso.

La Junta de Apelaciones del Sistema de Administración de Personal (en adelante J.A.S.A.P.) solicita revisión de la resolución del Tribunal Superior que le ordena que conteste un extenso interrogatorio sometido por la Oficina del Procurador del Ciudadano (*Ombudsman*). En el recurso se cuestiona el alcance del poder investigativo del *Ombudsman* sobre casos sometidos en los tribunales administrativos al nivel apelativo como J.A.S.A.P. Por entender que en las circunstancias particulares del caso de autos el *Ombudsman* debió de abstenerse de iniciar una investigación

cuasilegislativa de los trámites apelativos de J.A.S.A.P., disentimos.

## I

El conflicto entre las partes se originó en diciembre de 1986 cuando el Procurador del Ciudadano solicitó de J.A.S.A.P. un informe sobre "sus puntos de vista sobre el asunto de la querella" (Solicitud de revisión, *Exhibit* V, pág. 16) sometida por el Sr. Moisés Seín Feliciano por "alegada dilación en emitir un fallo con relación a su solicitud de apelación". Íd. Carta de 22 de diciembre de 1986 del licenciado Vera Mercado, Subprocurador del Ciudadano.

En enero de 1987 J.A.S.A.P. contestó que la apelación estaba bajo la consideración de ese tribunal administrativo-apelativo y, por lo tanto, fuera del alcance del poder investigativo del *Ombudsman*:

> Como es de su conocimiento, el señor Seín Feliciano es un litigante, que en los procedimientos adjudicativos efectuados ante este organismo cuasi-judicial, compareció adecuada y fielmente representado por abogado. Los principios de autonomía reconocidos a los organismos con facultades para oír y resolver controversias, el debido proceso de Ley y el derecho constitucional a la asistencia de abogado, imponen limitaciones a la intervención de terceros que no son parte legítimamente interesada en los procesos de adjudicación. Tales son las razones que motivaron al Honorable Tribunal Superior a resolver que: "La Ley Orgánica de la Oficina del Procurador del Ciudadano, Ley Núm. 134 de 30 de junio de 1977, 3 LPRA, 531 y ss., no confiere a dicha Oficina capacidad, ni jurisdicción para intervenir en los procesos adjudicativos y deliberativos de un organismo con funciones cuasi-judiciales como lo es la Junta de Apelaciones del Sistema de Administración de Personal". (Resolución del Honorable Tribunal Superior, Sala de San Juan, Honorable Roberts, Juez, en la *Oficina del Procurador del Ciudadano* vs. *Lic. Alfredo Segarra Martínez*, Civil Núm. 81-4084 (901)."
> Por lo anterior, sugerimos que su Oficina oriente al señor Seín Feliciano en relación a la normativa que contiene la de[c]i[s]ión del Honorable Tribunal Supremo en *Berríos* v. *Co-*

*misión de Minería*, 102 D.P.R. 228. A tenor con lo allí estable-cido, compete a la representación legal de la parte, la facultad para reclamar toda notificación adjudicativa. (Carta de 20 de enero de 1987 del Lic. Ramón Luis Julia Ramos, Director de Asuntos Legales de J.A.S.A.P.). Solicitud de revisión, *Exhibit* V, págs. 17–18.

Tres (3) meses después de recibir esta comunicación, el *Ombudsman* envió requerimientos adicionales formulados en los mismos términos que el anterior con relación a otras querellas. Nuevamente J.A.S.A.P. recordó que mientras la apelación estuviera pendiente de resolución final no podía suministrar la información solicitada. Ante la negativa de J.A.S.A.P., el Procurador del Ciudadano contestó que tenía facultad para investigar las actuaciones de los organismos cuasi judiciales. Sin embargo, aclaró que no era su inten-ción comparecer en el procedimiento adjudicativo ante J.A.S.A.P. ni que tampoco pretendía "intervenir en el pro-ceso deliberativo ... ni ... en ninguna forma influenciar la determinación en el caso". Solicitud de revisión, *Exhibit* V, pág. 26. A su vez afirmó que su intervención se justificaba "debido [a] la dilación de la Junta en llegar a una decisión ... ". Íd. Justificó su investigación en que "[e]l no tomar acción a su debido tiempo resulta en muchas ocasiones en que tal acción resulte incorrecta o inapropiada así como puede resultar en oposición y resentimiento por parte del ciudadano". Íd. Carta de 1ro de mayo de 1987 del Lcdo. Adolfo de Castro.

Poco tiempo después, J.A.S.A.P. informó que había re-suelto una de las apelaciones y que luego de considerar los planteamientos del *Ombudsman* entendía que no existía "impedimento jurídico alguno para que este foro pueda brindar a su oficina información sobre ciertos actos proce-sales de trámite llevados a cabo en apelaciones radicadas ... ". Solicitud de revisión, *Exhibit* V, pág. 34. Con estos propósitos se comprometieron a suministrar en el futuro

"datos de naturaleza objetiva y ajenos al trámite adjudicativo, tales como fecha de radicación, notificación de resoluciones finales sobre reclamación, fecha de señalamientos de vista pública y/o status procesal de la apelación". Íd. En su misiva también sugiere que, a los fines de hacer viable un mecanismo de comunicación rápida y económica, el *Ombudsman* nombre un oficial de enlace con la Secretaria de J.A.S.A.P. Carta de 2 de junio de 1987 del señor Cordero Otero, Presidente de J.A.S.A.P.

El *Ombudsman* no contestó esta comunicación. Por su parte, en julio, un (1) mes después de la carta del Presidente de J.A.S.A.P., notificó que estaba llevando a cabo "una investigación cuasi-legislativa" del tribunal administrativo-apelativo y envió un interrogatorio de cincuenta (50) preguntas y un requerimiento de documentos y estadísticas relacionadas con el presupuesto de la agencia y el manejo de los casos. Carta de 16 de julio de 1987 de la licenciada Serrano Blasini, Subprocuradora Auxiliar.

Ante la negativa de J.A.S.A.P. de suplir los datos solicitados, el Procurador del Ciudadano acudió al foro de instancia para que obligara al tribunal administrativo a contestar los interrogatorios. El Tribunal Superior no aceptó la defensa de cosa juzgada reclamada por J.A.S.A.P. y concluyó que el interrogatorio no intervenía con el proceso adjudicativo de J.A.S.A.P. y que tenía que ser contestado en treinta (30) días. Inconforme con este dictamen, J.A.S.A.P. acude ante nos por entender que la resolución es contraria a la doctrina de cosa juzgada y socava los poderes cuasi judiciales delegados a ese tribunal administrativo-apelativo.

## II

Examinemos en primer lugar una cuestión de orden procesal relativa a la decisión del Tribunal Superior de no

aplicar la doctrina de cosa juzgada.(¹) Esta defensa, *exceptio rei iudicae*, es la que "hace valer el demandado frente al demandante que ejercita nuevamente contra él una acción para un proceso, sobre un asunto juzgado con anterioridad con igual alcance". M.A. Del Arco Torres y M. Pons González, *Diccionario de Derecho Civil*, Pamplona, Ed. Aranzadi, 1984, T. I, pág. 600. Para que esta excepción pueda prosperar, el Código Civil exige determinadas condiciones de identidad de cosas, causas y personas, y la calidad con que lo *fueron* entre el caso resuelto anteriormente y el litigio posterior, 31 L.P.R.A. sec. 3343. Su propósito es impartirle fuerza y firmeza a la sentencia previamente dictada por un tribunal que actuó con jurisdicción. Como afirma Manresa: "Es un principio fundamental de nuestro ordenamiento jurídico adjetivo, apoyado en razones de orden social encaminadas a garantizar la certidumbre y seguridad de los derechos declarados por resolución judicial, la inmutabilidad de las sentencias que han llegado a alcanzar el concepto procesal de firmes y por ende su irrevocabilidad, en méritos de lo cual desde tiempo antiguo ha venido consagrándose, como norma, la santidad de la cosa juzgada, que sirve de base a la estabilidad del declarado y que solo permite actuar en consecuencia con lo resuelto (trámite de ejecución), sino que impide que pueda ser ulteriormente discutido." J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1967, T. VIII, Vol. 2, pág. 281.

En el caso de autos, J.A.S.A.P. reclamó la defensa de cosa juzgada porque existía la identidad entre el caso *Oficina del Procurador del Ciudadano v. Alfredo Segarra*

---

(¹) En *Oficina del Procurador del Ciudadano v. J.A.S.A.P.* (1-4084 (901) el Tribunal Superior resolvió que "la Oficina del Procurador del Ciudadano no tiene capacidad jurídica para intervenir en los procesos adjudicativos que se llevan a cabo en la Junta de Apelaciones del Sistema de Administración de Personal". Solicitud de revisión, *Exhibit* IV, pág. 15. Al no recurrir ante nos, la decisión del Tribunal Superior se convirtió en final.

*Martínez*, Civil Núm. 81-4048 (901), y el de autos. Ciertamente, se cumplía el primer requisito de identidad de cosa u objeto. La cosa es el "objeto o materia sobre la cual se ejercita la acción". *Lausell Marxuach v. Díaz de Yáñez*, 103 D.P.R. 533, 535 (1975). En este caso el objeto es igual al del caso anterior, esto es, la facultad del Procurador del Ciudadano de investigar el proceso deliberativo de J.A.S.A.P.

También están presentes el requisito de identidad de causa que es el "'motivo de pedir [o] el fundamento capital, el origen de las acciones". *A & P Gen. Contractors v. Asoc. Caná*, 110 D.P.R. 753, 765 (1981). En ambos casos la causa de la acción fue investigar la dilación en el trámite de los casos ante J.A.S.A.P. motivado por querellas de apelantes insatisfechos con la lentitud del proceso apelativo.

Igualmente existe completa identidad de personas, pues los litigantes son el Procurador del Ciudadano y el Presidente de J.A.S.A.P.

Bajo un análisis rigurosamente civilista estaban presentes las identidades necesarias para que prosperara la defensa de cosa juzgada. Sin embargo, en el pasado hemos reconocido los linderos de esta doctrina, particularmente en litigios permeados de incuestionable interés público y con una controversia de especial importancia en la administración pública del país que requiere unos pronunciamientos de este Tribunal. *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988). Véase, también, *Pagán Hernández v. U.P.R.*, 107 D.P.R. 720, 735–738 (1978).

El recurso instado plantea, por primera vez en este foro, *una controversia sobre el alcance del poder investigativo del Procurador del Ciudadano sobre un tribunal administrativo apelativo como J.A.S.A.P.* La controversia es de interés para todos los otros tribunales administrativos-apelativos de la Rama Ejecutiva que tienen poderes adjudicativos delegados por la Asamblea Legislativa al amparo de su poder constitucional. En esta dimensión, el conflicto entre el Procurador del Ciudadano y J.A.S.A.P. puede

repetirse con otras entidades análogas y entre las mismas partes en otras investigaciones originadas por el *Ombudsman*. Ante estas circunstancias, se sirven mejor los intereses de la justicia si no aplicamos estrictamente la excepción de cosa juzgada.

## III

Aunque la Oficina del Procurador del Ciudadano se crea recientemente mediante la Ley Núm. 134 de 30 de junio de 1977 (2 L.P.R.A. sec. 701 *et seq.*), la institución del *Ombudsman* se origina en Suecia en el siglo XVI y, en específico, en la Constitución de 1809. Véase W. Gellhorn, *The Swedish Justitieombudsman*, 75 Yale L.J. 1 (1965). En su dimensión más amplia, el *Justitie Ombudsman* sueco es un representante del Parlamento que actúa como vocero y defensor de los ciudadanos. Su obra ha inspirado la creación de instituciones análogas en Finlandia, Dinamarca, Noruega, Nueva Zelandia, Gran Bretaña, Canadá y Estados Unidos. Véase W. Gellhorn, *Ombudsmen and Others*, Massachusetts, Harvard University Press, 1966.

En todos estos países la institución ha recibido gran acogida como un instrumento para controlar y fiscalizar las agencias gubernamentales. Adscrito a la Legislatura, fiscaliza a la administración pública mediante la investigación de quejas específicas de los ciudadanos contra errores administrativos. Aunque no tiene poder para revocar las decisiones gubernamentales, su efectividad depende de una combinación única del poder de investigar con la libertad de criticar públicamente las acciones administrativas y recomendar medidas correctivas. D.C. Rowat, *El Ombudsman*, Méjico, Ed. Fondo de Cultura Económico, 1977, pág. 39.

En Puerto Rico no fue hasta el 1966 que la Asamblea Legislativa decidió examinar la experiencia escandinava

con esta institución.(²) A petición de la Comisión Especial para el Estudio del *Ombudsman* de la Cámara de Representantes, la Comisión de Derechos Civiles preparó un extenso estudio con el propósito de examinar la posible incorporación de esa entidad fiscalizadora a nuestra administración pública. El informe comparativo de la experiencia en otros países recomendó favorablemente la creación de un *Ombudsman* adaptado a nuestro ordenamiento constitucional y al esquema de gobierno. La Comisión apuntó que su efectividad en Puerto Rico dependería de que no se le concibiese como un "superadministrador" sino como "un vigilante que crea el órgano legislativo del estado para cerciorarse de que todo el mecanismo de la administración funcione de acuerdo a las normas legales que lo rigen". *La Institución del Ombudsman*, Comisión de Derechos Civiles de Puerto Rico, 1968, pág. 33.

Así concebido, la Comisión señaló que para facilitar la incorporación de este esquema —originado en un Gobierno parlamentario— a nuestro sistema de separación de poderes era imprescindible que se diseñara como un recurso adicional que "utiliza el ciudadano, (o el empleado público), cuando los mecanismos administrativos, por causa de la negligencia, arbitrariedad o falta de pericia de quienes los tienen a su cargo, no producen el resultado deseado". (Énfasis suprimido.) *La Institución del Ombudsman*, supra, pág. 32. En ese momento se activa su poder investigativo para localizar la causa del problema y recomendar medidas para corregirlo. No es un sustituto de los instrumentos creados anteriormente por el Estado para vindicar los derechos de los ciudadanos tales como los tribunales admi-

---

(²) Anteriormente, en 1963 el Prof. Federico Cordero recomendó que se estudiase la viabilidad de incorporar en Puerto Rico el *Ombudsman* sueco. Véase F.A. Cordero, *Operación Metro: A case Study of the Power Structure in Action and the Crisis in the Planning Process in Puerto Rico*, 32 Rev. Jur. U.P.R. 353 (1963). Véase, también, E. Colón Solivan, *Versión Puertorriqueña del Ombudsman*, San Juan, Oficina de Personal, 1966.

nistrativos al nivel apelativo y la Comisión de Derechos Civiles.

Por su parte, la Comisión Especial de la Cámara de Representantes sometió un informe el 9 de marzo de 1967 que concluyó que por su pequeñez territorial, centralización gubernamental, nivel de desarrollo de la administración pública y estabilidad política, Puerto Rico tenía las condiciones necesarias para crear un Comisionado de Investigaciones basado en el modelo escandinavo:

> Esta Comisión está conciente de que en Puerto Rico existen diversos medios de control administrativo y algunos sistemas para la atención de querellas de los ciudadanos. No obstante, creemos que éstos no son suficientes y que a la ciudadanía hay que ofrecerle al máximo los medios de dejar oir sus quejas sobre el proceso gubernamental.
>
> Por todas las razones antes mencionadas y en vista de que la experiencia ha demostrado que esta oficina ayuda notablemente a mejorar la calidad de la Administración Pública y de los servicios que los gobiernos ofrecen además de mejorar la imagen que de su gobierno tienen los ciudadanos es que esta Comisión recomienda la adopción de la institución Ombudsman para Puerto Rico y a esos efectos se acompaña este informe con un anteproyecto de ley. Informe de la Comisión Especial para el Estudio del Ombudsman a la Cámara de Representantes, 9 de marzo de 1967, pág. 25.

Apoyado por estas recomendaciones y basado en un modelo preparado por el profesor Gellhorn, el Rep. Luis Camacho presentó en el 1967 el P. de la C. 784. Aunque no fue aprobado inicialmente, dicho proyecto fue presentado nuevamente a la Cámara de Representantes en los próximos tres (3) cuatrienios hasta que finalmente una versión revisada fue aprobada en el 1977, mediante la Ley Núm. 134 de 30 de junio, para crear la Oficina del Procurador del Ciudadano adscrito a la Rama Ejecutiva. *El Ombudsman, su naturaleza, sus alcances y su poder ejecutivo*, Oficina de Servicios Legislativos de Puerto Rico, 1977. En 1984 se enmendó la ley para transferir la entidad a la Rama Legislativa.

IV

La ley puertorriqueña del *Ombudsman* lo autoriza a "investigar los actos administrativos", 2 L.P.R.A. sec. 702(b), de "cualquier entidad, departamento, junta, comisión, división, negociado, oficina, corporación pública o institución gubernamental de la Rama Ejecutiva", con excepción de la Oficina del Gobernador, los Registradores de la Propiedad y la Universidad de Puerto Rico respecto a sus funciones docentes. 2 L.P.R.A. sec. 702(a). Del texto se desprende que el legislador expresó en forma definitiva su intención de excluir del alcance del Procurador del Ciudadano a solamente tres (3) entidades de la Rama Ejecutiva. Al expresar su intención de excluir únicamente a esas agencias, los principios de hermenéutica legal reconocidos en la máxima *expressio unius est exclusio alterius* conllevan la inclusión de los demás. R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., pág. 345. Por esta razón, el Procurador del Ciudadano tiene el poder para investigar los actos administrativos de J.A.S.A.P. y de otras entidades análogas.

Sin embargo, a tenor con la filosofía de que el *Ombudsman* no iba a ser un "superadministrador" ni un adjudicador de casos específicos, el legislador limitó los actos administrativos que podían ser investigados:

> Serán materias propias de investigación, cualquier acto administrativo que aparente ser:
> (a) contrario a la ley o reglamentos;
> (b) irrazonable, injusto, arbitrario, ofensivo o discriminatorio;
> (c) basado en un error de hecho o en motivos improcedentes e irrelevantes;
> (d) no esté acompañado de una adecuada exposición de razones cuando la ley o los reglamentos lo requieran; o
> (e) ejecutado en forma ineficiente o errónea.
> El *Ombudsman* podrá realizar la investigación a los efectos

de recomendar un remedio adecuado. (Énfasis en el original.) 3 L.P.R.A. sec. 713.

Al igual que en los países escandinavos, el Procurador del Ciudadano no puede ordenarle a un funcionario que tome un determinado curso decisorio ni tampoco puede revocar su dictamen. "Una característica fundamental de la institución del Ombudsman es que no tiene poder para emitir órdenes que tengan fuerza legal obligatoria, tampoco puede revocar órdenes administrativas que considere incorrectas, de igual manera carece de poder para requerirle a los funcionarios públicos que reabran un caso o que reconsideren un juicio ya emitido." *La Institución del Ombudsman*, supra, pág. 3.

Con el propósito de evitar una duplicidad de funciones y una intervención prematura con otras agencias, la ley orgánica dispone que el *Ombudsman* no puede investigar aquella querella en que a su juicio "haya un remedio adecuado en ley para reparar el agravio, ofensa o injusticia objeto de la querella", 2 L.P.R.A. sec. 711(a), o que "esté siendo investigada por otra agencia y a juicio del *Ombudsman* actuar sobre la misma representaría una duplicidad de esfuerzos y recursos". 2 L.P.R.A. sec. 711(f).

Esta norma es similar a la doctrina de agotamiento de remedios administrativos utilizada por los tribunales y observada por otros *Ombudsman*. Así se evita una duplicidad de esfuerzos y recursos, una inoportuna intervención con el proceso adjudicativo y una actuación contraria al espíritu y a la letra de la ley que crea el *Ombudsman*.

Con los tribunales administrativos al nivel apelativo como J.A.S.A.P., su discreción debe ejercerse con particular prudencia y de una forma razonable para evitar intervenciones inoportunas en el proceso adjudicativo. Estos organismos especializados con poderes cuasi judiciales para revisar a nivel apelativo las determinaciones de otras agencias administrativas requieren para su efectividad que no se permita, ni a las partes ni a los terceros, que ejerzan presión indebida sobre el proceso adjudicativo. Pre-

cisamente, por eso son cuerpos colegiados con unos miembros nombrados por término fijo para que tengan independencia de criterio y revisen las decisiones apeladas con unas garantías parecidas a las judiciales. También deben gozar de la independencia que caracteriza la adjudicación en los tribunales. Por estos atributos tan particulares hay muy pocos tribunales administrativos apelativos como J.A.S.A.P.

*Como regla general, por la naturaleza del tribunal administrativo al nivel apelativo y por sus poderes cuasi judiciales, y al considerar el ámbito de la revisión judicial de sus determinaciones, el Ombudsman debe posponer su investigación cuando la apelación está bajo la consideración de esos organismos.* No obstante, al adoptar esta norma, el legislador otorgó al Procurador del Ciudadano discreción para investigar el acto administrativo "siempre que a su juicio existan razones suficientes que den lugar a una investigación ...". 2 L.P.R.A. sec. 711. Aunque se le concede discreción al Procurador del Ciudadano para investigar actos administrativos antes de que exista un fallo final por la agencia intervenida, la ley requiere que el *Ombudsman* tenga "razones suficientes" para no requerirle al ciudadano que agote los remedios disponibles en el foro administrativo. Su discreción está condicionada a una determinación previa de que existen suficientes razones para no esperar que concluya el trámite administrativo. *En los casos de los tribunales administrativos al nivel apelativo, el ejercicio de esta discreción debe estar avalado por una determinación previa adecuadamente fundamentada de que la gestión ante ese organismo es inútil e inefectiva* o que no ofrece un remedio adecuado en vista de los intereses afectados y la inminencia del daño.

## V

En el caso particular de J.A.S.A.P., la ley le confirió jurisdicción apelativa para revisar las acciones o decisiones

de la Oficina Central, de los administradores individuales y de las autoridades nominadas en violación a la Ley de Personal del Servicio Público de Puerto Rico. 3 L.P.R.A. sec. 1394. También dispuso un recurso de revisión judicial de las decisiones de J.A.S.A.P. al Tribunal Superior. 3 L.P.R.A. sec. 1396. J.A.S.A.P. fue creada como un organismo colegiado e independiente: "La intención legislativa fue claramente la creación de un tribunal apelativo a nivel administrativo con poderes adjudicativos, especializado en asuntos de personal, que fiscalizara rápida y efectivamente las decisiones de los administradores individuales y la Oficina Central de Administración de Personal." *Díaz Marín v. Mun. de San Juan*, 117 D.P.R. 334, 338 (1986).

Un análisis integral de la totalidad de los requerimientos del Procurador del Ciudadano a J.A.S.A.P. nos convence que la controversia comienza con la petición de unos informes sobre las dilaciones en las adjudicaciones de ciertas apelaciones sometidas ante J.A.S.A.P. y culmina con una investigación cuasilegislativa y el extenso interrogatorio que origina este litigio. La negativa de J.A.S.A.P. de exponerle al *Ombudsman* "sus puntos de vista" sobre los distintos casos ante su consideración plenaria (véase carta de 22 de diciembre de 1986, del Lcdo. Adolfo de Castro al Lcdo. Alfredo Segarra Martínez) dio origen a una amplia investigación directamente relacionada y que incide sobre su proceso adjudicativo.

Aunque en su comparecencia el *Ombudsman* acepta que no puede "intervenir con el proceso mental-deliberativo de los miembros de la Junta" (Alegato de la parte demandante-recurrida, pág. 4), señala que su investigación no es sobre áreas adjudicativas. Sin embargo, en su carta de 16 de julio de 1987 reconoce que la investigación fue "motivada por la radicación en nuestra oficina de varias querellas relacionadas con la dilación en el trámite de casos ante la Junta". Solicitud de revisión, *Exhibit* VI, pág. 47. Aunque J.A.S.A.P. estuvo dispuesta a suministrar información "de

naturaleza objetiva y ajenos al trámite adjudicativo, tales como fecha de radicación, notificación de resoluciones finales sobre reclamación, fecha de señalamientos de vista pública y/o status procesal de la apelación" (Solicitud de revisión, *Exhibit* V, pág. 34) —Carta de 2 de junio de 1987, del Lcdo. Nelson R. Cordero Otero al Lcdo. Adolfo de Castro— el Procurador del Ciudadano insistió en continuar con la investigación "cuasi legislativa" anunciada como resultado de la negativa de J.A.S.A.P.

Cuando el *Ombudsman* intervino en estos casos requiriendo de J.A.S.A.P. que expusiera "sus puntos de vista" sobre la apelación, el asunto estaba pendiente de adjudicación y actuar sobre ésta constituía una indebida interferencia con las funciones del foro apelativo. De los autos no se desprende que los querellantes acudieron ante J.A.S.A.P. en pleno para solicitar una inmediata adjudicación de su apelación o que habían recurrido al foro judicial para que ordenaran al foro administrativo-apelativo que oportunamente resolvieran la apelación.

En vista de que las querellas que originaron la intervención del Procurador del Ciudadano estaban siendo dilucidadas por J.A.S.A.P., el *Ombudsman* cometió un error al reaccionar a los reclamos legítimos de independencia en las deliberaciones legítimamente expuestas por el foro apelativo-administrativo con una investigación abarcadora de sus procedimientos. Aunque a primera vista la información solicitada no parece estar vinculada con las querellas que originaron el conflicto entre agencias, un examen detallado de los datos solicitados nos convence que la investigación cuasi legislativa estaba relacionada con el conflicto surgido cuando J.A.S.A.P. se negó a contestar los requerimientos originales del *Ombudsman* referentes a las apelaciones pendientes de adjudicación. De hecho, la investigación se anunció poco tiempo después de un fuerte intercambio de comunicaciones que surgió cuando J.A.S.A.P. contestó las requisiciones originales afirmando que la controversia ju-

risdiccional había sido previamente resuelta por el Tribunal Superior.(³)

Por otro lado, los autos tampoco revelan que había una justificación independiente para una investigación tan abarcadora de J.A.S.A.P. De la prueba documental se desprende que el *Ombudsman* había recibido pocas querellas sobre el trámite de J.A.S.A.P. cuando inició su extensa investigación. Así lo corrobora el Décimo Informe Anual para 1986–1987, que revela que durante 1986 el Procurador del Ciudadano recibió solamente doce (12) querellas de J.A.S.A.P. de un total de siete mil ciento veinticinco (7,125) casos sometidos contra las agencias de la Rama Ejecutiva. Décimo Informe Anual, Oficina del Procurador del Ciudadano, 1986–1987, pág. 39.(⁴) Tampoco hay una afirmación adecuadamente fundamentada de que la experiencia previa con J.A.S.A.P. revelaba que sus remedios eran inútiles e inefectivos o que el trámite apelativo era irrazonablemente largo y que se justificaba una abarcadora pesquisa del foro apelativo. Aunque somos conscientes de la importancia de la figura del *Ombudsman* y su interés legítimo en agilizar los trámites administrativos gubernamentales, en este caso no se demostró la necesidad de una abarcadora investigación "cuasi legislativa" de J.A.S.A.P.

En estas circunstancias, el Procurador del Ciudadano debió prudencialmente abstenerse de iniciar la investigación cuasi legislativa de J.A.S.A.P. en una etapa del proceso adjudicativo en que la información requerida incidía sobre el proceso deliberativo y obligaba a ese tribunal administrativo al nivel apelativo a dedicar sus limitados recursos humanos, a recopilar información para el *Ombudsman* y no a resolver prontamente las apelaciones pendientes. De haber existido "razones suficientes" para

---

(³) Véase esc. 1.

(⁴) Entre julio de 1986 y junio de 1987 el Procurador del Ciudadano recibió catorce (14) querellas contra J.A.S.A.P. de un total de seis mil trescientos noventa y un (6,391) casos presentados. Undécimo Informe Anual, Oficina del Procurador del Ciudadano, 1987–1988, pág. 40.

continuar con la investigación de los procedimientos administrativos, correspondía al *Ombudsman* avalar su determinación con una explicación adecuadamente fundamentada de por qué no se debía esperar que los querellantes agotaran los remedios disponibles en J.A.S.A.P. Por estas razones, disentimos de la sentencia emitida por una mayoría de este Tribunal.